## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

Jasmine Vega,                                         Case No. 3:10CV1870

        Plaintiff,

      v.                                              **OPINION & ORDER**

Sacred Heart University,

        Defendant,


**Carr. Sr. U.S. District Judge:***

This is a suit by a Jasmine Vega, a former student at the defendant Sacred Heart University (SHU). Plaintiff claims that SHU is liable for negligently inflicting emotional distress on her and resulting damages.

Ms. Vega is a resident of New York; SHU is in Fairfield, Connecticut. Diversity jurisdiction therefore exists.

Following pretrial proceedings before the District Judge ordinarily assigned to this case, including entry of summary judgment, in part, in favor of the University, I presided at a non-jury trial during January 28-30, 2013. Following submission of post-trial memoranda and review of my trial notes and the record, I find, for the reasons that follow, in favor of the University and against the plaintiff.

_____
* James G. Carr, Sr. U.S. District Judge, N.D. Ohio, sitting by designation.

**Background**

After attending Empire State College for a year, plaintiff enrolled at SHU in the Fall of 2008. A year later, in the Fall of 2009, she became a pledge of Delta Phi Kappa sorority.

SHU has an express and firm anti-hazing policy. Nonetheless around 10 p.m., one of the sorority women called plaintiff and then came to her room. She told plaintiff to accompany her. She placed plaintiff in a car, and plaintiff was taken, as were other sorority pledges, to a house about a mile from campus. Plaintiff and the others were taken to the basement.

At some point before arriving there, plaintiff had texted her mother, Jacqueline Rossy, telling her she had been taken, and did not know where she was going. Plaintiff's mother and father decided to drive to Fairfield.

The hazing consisted primarily of calisthenic-type exercise and verbal abuse, though on one occasion an alumna of the sorority struck the plaintiff. Toward the end of the incident, as plaintiff and the others were awaiting their return to campus, one of the sorority members received a cell phone call from Ms. Rossy. The woman gave plaintiff the phone, and she spoke with her mother. Shortly thereafter, plaintiff arrived back on campus, where her parents were waiting at her dormitory.

Though the testimony about the duration of the incident was somewhat unclear, I find that it lasted about three hours.

Ms. Rossy became upset when she saw the plaintiff, who appeared pale and wet, as if someone had poured water on her.[1] After a resident advisor and a campus security officer declined

---

[1] Plaintiff testified that, while waiting to be returned to campus, she had had to stand in the rain for fitfteen to twenty minutes.

to call the police, the parent took plaintiff to a diner and then drover her home. According to Ms.

Rossy, plaintiff had nightmares and was screaming in her sleep.

On Sunday, October 4, 2009, Ms. Rossy e-mailed various campus officials, including Dean

of Students, Lawrence Wielk. In her e-mails she said she would be on campus on Monday, and she

wanted the police present. The next day she and plaintiff went to the Public Safety Office. There

they met Dean Wielk. He told them that the University needed statements before the police could

be called in.

In any event, a police officer came to the Public Safety Office. He went with Ms. Rossy and

plaintiff across campus to plaintiff's dormitory. The officer conducted an interview with them in an

office that was visible to others. At least one of the sorority members appeared to see plaintiff while

being interviewed. No charges were filed.

On the next day, Tuesday, October 6, 2009, plaintiff and her mother met with Dean Wielk.

They told him that several members of the sorority had contacted her asking her, among other

things, to help the sorority with its problems. Plaintiff, however, resumed attending classes that day.

The following day, Wednesday, October 7, 2009, Dean Wielk notified the sorority's

members that they were suspended from the SHU campus. This meant that none of them could

attend classes or participate in any academic or non-academic activities. Dean Wielk also suspended

the sorority. He also instructed the sorority's members to have no contact with the plaintiff or any

of the other sorority pledges.

Dean Wielk e-mailed plaintiff the same day, telling her about the suspension of the sorority

members pending further investigation. He also told plaintiff the sorority members were under the

no-contact order. He also told her he had warned the women that a violation of the no-contact order

would result in further discipline.

The next day, Thursday, October 8, 2009, Ms. Rossy again met with Dean Wielk. She asked

for a "safety transfer," which is a process in the New York City public schools, where Ms. Rossy

is a teacher. Under the safety transfer policy, public school officials may permit a student needing

to transfer schools for reasons of personal safety to do so.

Dean Wielk told Ms. Rossy that federal loans and University grants could not be transferred

and the University could not return her tuition.[2] According to Ms. Rossy, she did not believe that

her daughter would be safe remaining at SHU because the school had not gotten back to her after

the hazing incident.[3]

Sometime during the following (Columbus Day) weekend, Dean Wielk e-mailed the plaintiff,

assuring her that it was safe for her to return to campus.

Two subsequent events, one during the early afternoon of Wednesday, October 14, 2009, the

other during the early evening of November 16, 2009, provide the basis for plaintiff's claim against

SHU of negligent infliction of emotional distress.[4]

---

[2] In other words, SHU did not have a policy similar to that of the New York public
schools. This is understandable, in view of the fact that unlike the schools within the same
district, SHU is a free-standing entity with, in all likelihood, its own tuition and fee refund
policies. I take judicial notice that such policies are commonplace at institutions of higher
education.

[3] I find Ms. Rossy's testimony about the complete lack of information from SHU about
the discipline the University was imposing not to be credible. Given the frequency of
interactions between Ms. Rossy and Dean Wielk and others, to contend, as Ms. Rossy did, that
the University was not keeping her reasonably well informed is not plausible.

[4] Before either of these incidents, plaintiff saw some entries on the Facebook page of Ms.
Jean-A' Layn Segalla, a member of the sorority who had played an acive role in the hazing. (Pl.
Ex. P-3).On review of these entiries, I find that they could not reasonably have contributed to

### 1. The Encounter on October 14, 2009

As of Wednesday, October 14, 2009, Dean Wielk had lifted the academic suspension of the sorority sisters. He had not, however, removed the no contact condition or allowed the sorority to return or resume activities.[5] Neither he nor anyone else at SHU told plaintiff that he had lifted the academic suspension, which allowed the sorority members to return to campus and go to classes.

Plaintiff's mother had continued to return to campus daily. She did so again that Wednesday, planning to meet the plaintiff early that afternoon. She went to the Public Safety Office, as she wanted to learn what further steps the University would be taking to protect the plaintiff.

Both the Public Safety Office and Dean Wielk's office are in the administration building. The Public Safety Office is on the first floor, adjacent to the hallway leading from an entrance into the building. The window to the office where visitors report is on a side hallway just off the hallway to the main entrance. A person facing that window has her back to the building entrance. Ms. Rossy was at the window, waiting for plaintiff.

Plaintiff was walking from another building, where she had taken a test, to the administration building to go to a class and then meet her mother.

What happened next was disputed.

_____

any of the emotional distress that plaintiff attributes to SHU's negligence. The University, moreover, cannot be held accountable for things others communicated to Ms. Segalla or she to them, provided they were not communicated by the author to the plaintiff.

Plaintiff also received two annoying anonymous phone calls from two nonstudents. Likewise, these third party calls, though directed to plaintiff, cannot give rise to liability against the University, which has no control over the activities of nonstudents.

The ban against the sorority is permanent. Further disciplinary proceedings against eleven of the sorority members through a University judicial process resulted in additional disciplinary action on October 26, 2009.

Plaintiff testified:

Q.     You were going your own way to your class?

A.     Yes.

Q.     Where was your mother going?

A.     My mother as going to security to check about my safety.

Q.     Okay. And so what happened next?

A.     As I was walking to my class, I saw [Jean-A'Layn Segalla[6]], Stacy [Danquah[7]] coming from the direction of where dean Wielk's office is at, like from the section where Holly lounge is, I saw them turn the corner. Right when I saw them, I turned, I started walking to where my mother was in security.

Q.     In other words, you saw them, let me just be clear, you saw them coming from dean Wielk's office?

A.     Yes, in that section.

Q.     Coming toward you?

A.     Yes.

Q.     So you decided you would turn around and go over to public safety?

A.     Yes.

Q.     Okay.

---

[6] A sorority member who had been involved in the hazing, and who was subject to the no-contact order.

[7] Another sorority member.

A.      I noticed they were calling me because by the theater, there's windows that reflect and as I'm walking I'm seeing in the reflection that they're still behind me and wanting to follow me all the way, all the way, all the way to where my mother was, where I was walking. At one point I felt a tug on the hood of my jacket and I heard the girl, one of the girls say I got her, and it made me even more scared.

Q.      So where did you go then?

A.      I was already entering at that point into the building where my mother was and I just ran to my mother.

Q.      So now when you described this, were you in an interior hallway with reflecting glass or were you outside the building?

A.      It's hard to describe. I would have to draw a picture.

Q.      I'm just trying to figure out if you were indoors or outdoors.

A.      It was outdoors, it was on the sidewalk of the building.

Q.      Then you went into the building?

A.      Yes.

Q.      Okay.

                    THE COURT:        Where were you when you felt the tug and heard that comment?

                    THE WITNESS:      I was already halfway into the building.

                    THE COURT:        How do you mean halfway into the building?

                    THE WITNESS:      I was already past the second door, my mother was a few feet away from me.

7

Q.      So you're going into the entrance?

A.      Yes. *My mother had her back turned when I was walking towards her and when I got next to her she turned and looked at me and saw me.*

Q.      So then what did you do?

A.      I didn't even look back, I just looked at my mom and *my mom said what happened?* She just looked and saw the girl behind me, and I heard the girls run that way, like toward the cafeteria. Which I didn't understand, at to, you know, why they followed me, if they weren't supposed to be on campus as it is.

Q.      These are all sorority members?

A.      Yes.

Q.       Who are supposed to be suspended?

A.      Yes.

(Tr. Vol. I, pg. 158, line 19 - pg. 161, line 8) (emphasis supplied).

Ms. Rossy testified that she saw plaintiff enter the building. Behind her were three members of the sorority. According to her, as they entered, Segalla grabbed the hood on plaintiff's coat and said, "We got her." When Segalla saw Ms. Rossy, she appeared shocked, and she and the other two girls ran on down the hallway.

This incident, which Ms. Rossy said she saw, occurred, she stated, inside the building. Ms. Rossy also stated the encounter took place about six feet from where she was standing.

8

Segalla's testimony about the encounter directly contradicted that of plaintiff and her mother.[8] According to her, she and two other sorority members, Eylse Mannino and Stacy Danquah, were going to the Public Safety Office  to report that news crews were outside their off-campus residence.[9] As they came down the hall toward the entrance (and the side hallway to the Public Safety Office, they saw the plaintiff and Ms. Rossy together in front of them, and also headed toward the Public Safety Office).

On seeing the plaintiff and Ms. Rossy, Segalla and the other two women turned, went in the opposite direction, and decided to go to Dean Wielk's office. They wanted to tell him that they had seen the plaintiff, and they were aware of the no contact order.

Segalla testified that no one had touched the plaintiff; indeed, that they had not gone close enough to her to do so. Nor did any of the women say anything to her. (Tr. Vol 2, pp. 16-18).  As they approached the building, they ran past the plaintiff, as they knew that they were to have no contact with her. They were afraid of getting into more trouble, and they wanted to alert the Dean to the fact that they had been near the plaintiff as they approached or came into the building.

Segalla testified that no one touched the plaintiff or said anything to her.[10]

---

[8] Segalla also gave a different version of the hazing and its aftermath than plaintiff and Ms. Rossy. It is not necessary, for purposes of this decision, to resolve conflicts in the testimony about the events of October 2-3, so I view them in the light most favorable to the plaintiff.

[9] Someone had notified the media about the hazing, and the incident appears to have gained a degree of notoriety and public attention.

[10] A deposition of Danquah likewise came into evidence. Her testimony about pertinent events corroborated Segalla's testimony.

After the encounter, plaintiff and her mother met with Mr. Fernandez and told him what had happened. Ms. Rossy told him that the women had followed the plaintiff all the way to the Public Safety Office and almost "jumped" her.

Fernandez said she had to report the incident to Dean Wielk. Ms. Rossy said she wanted the police called. Fernandez declined to do so, so Ms. Rossy and plaintiff went directly to the Police Department without seeing Dean Wielk. The officer who took their report told them that he would inform Mr. Fernandez that they had filed the report and the University had to conduct an investigation.

Plaintiff returned home with her mother. It had been her understanding that the sorority members were under suspension, she had been surprised that they were in school, and Ms. Rossy did not feel that it would be safe leaving her there. According to Ms. Rossy, Dean Wielk threatened to have her arrested if she returned to school. Thereafter, whenever Ms. Rossy returned to school, an officer from the Public Safety Office would accompany her while she was on campus.

After that incident, plaintiff moved home and sought to finish her work without attending classes because, she testified, she did not feel safe on campus. To that end she communicated directly with her professors. She also began a course of mental health treatment with Dr. Hernandez.

### 2. Encounter on November 16, 2009

The second incident occurred when plaintiff was going into her dormitory room around 6 p.m. on Monday, November 16, 2009. As she did so, she saw Segalla in the room's common area, had a panic attack, and was taken for an overnight stay to the hospital.

Plaintiff began her testimony with recounting a text message from another student, who asked her to return a pair of shoes. Plaintiff had expected to be at a doctor's appointment all day.

10

On receiving another text message from two roommates, who thought she had been seen on campus, plaintiff replied that she was not on campus. When her doctor's appointment ended somewhat early, she decided to go to the University, return the shoes, and pick up some things from her room. She rode to the University with her mother, father, uncle, and sister, as she anticipated having to move "stuff" from her room.

When she entered her room, she saw Segalla, and had the panic attack. While a resident advisor was tending to her, her mother was trying to call the police. She was taken to the emergency room.

Segalla happened to be in the room because she and one of plaintiff's roommates had agreed to go to supper together. Plaintiff had gone to the room to meet the roommate before going to the dining area. Neither she nor the roommate expected plaintiff to be on campus that day, much less during the brief period that Segalla was in the room.

Once plaintiff and her family entered and plaintiff became distressed, Segalla wanted to leave. The plaintiff's uncle kept her from doing so. He was charged with a misdemeanor for his actions.[11]

### Discussion

To establish a claim of negligent infliction of emotional distress, a plaintiff must prove "1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; 2) the plaintiff's distress was foreseeable; 3) the emotional distress was severe enough that it might result in illness or bodily harm; and 4) the defendant's conduct was the cause of the plaintiff's distress. *E.g., Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003).

---

[11] The charge was still pending as of the date of the trial.

I find for the defendant for three reasons.

First, with regard to the incident of October 14, 2009, I credit the testimony of the Segalla and Danquah that they neither approached, spoke to, or touched the plaintiff. I find unbelievable the testimony of plaintiff and her mother to the contrary.

Second, even if I were to credit the plaintiff's version, I find that the University could not have foreseen that that encounter, which was not deliberate on the part of the three women might occur. There is simply no evidence in the record to support a contention that the women knew plaintiff would be on campus, much less that they sought her out.

Third, the University likewise could not have foreseen the entirely unexpected encounter between plaintiff and Segalla in plaintiff's dorm room. There is no evidence that either Segalla or plaintiff's roommate expected plaintiff to be there. On the contrary, they had every reason to believe that she would not be – she was at the time commuting from home to her classes.

Neither incident involved, moreover, a violation of the no-contact order. On both occasions, Segalla, once aware she was in plaintiff's presence, sought to leave immediately. She reported the first encounter to the Dean. During the second incident Segalla tried to leave the dorm room, but plaintiff's uncle kept her from doing so. The University cannot be held liable for unforeseeable events, or for unsuccessful efforts to comply with the no-contact order.

The most difficult aspect of this case, and one which I have considered at length before deciding the issue, is understanding what happened on October 14, 2009, near the Public Safety Office. The two versions are simply not reconcilable. On balance, I have concluded that it is more likely than not that the incident unfolded as Segalla and Danquah said it did.

First: I credit the women's motive in heading for the Public Safety Office: news crews were outside their residence. It is understandable that young women in their situation, having just been allowed to return to classes, would want to notify University officials about the media's intrusion into their lives.

Second: the fact that they remained at risk of discipline if they violated the no-contact order provided a reason to avoid the plaintiff, and thus, any contention that they had disregarded the no-contact order.

The University's actions almost immediately after plaintiff reported the hazing had been emphatic and vigorous. It had barred *all* the sorority's members from all academic and non-academic activities and expelled the sorority itself from the campus. There was every reason for those subject to the no-contact order to apprehend that violation of that order would lead to even more severe discipline, including, possibly, permanent expulsion.

The women, especially those who, like Segalla, had played a role in the hazing, thus had every reason to avoid anything that might get them in trouble and jeopardize further their ability to remain in good standing. It simply is not at all likely that they would go out of their way to run the risk of further discipline, much less that they would do so, if effect, at the doorstep of the campus police department and when the plaintiff's mother was present as a potential witness of any misconduct.

Third, the alleged incident occurred around the corner from the Public Safety Office. A less likely venue for the women to harass the plaintiff is hardly imaginable.

Fourth, and crucially, there are some fundamental discrepancies between plaintiff's testimony and that of her mother. While both agreed Ms. Rossy was at the window of the Public

13

Safety Office, plaintiff testified her mother turned after the alleged touching and statement, "We got

her," and asked plaintiff, "What happened?" This indicates that Ms. Rossy did not in fact, see what

she claims to have seen.

I am further persuaded that Ms. Rossy was not testifying truthfully about what she claims

to have seen because she was overall not a particularly credible witness.

Plaintiff, like her mother, had a motive to embellish, if not fabricate entirely, her testimony.

After all, she is seeking substantial compensation on the basis of already slender evidence. This gave

her, as it often does to others in the same situation, reason and motive to relate a version that was

most favorable to her cause and claim.[12]

I also find, moreover, that the University's response to the  October 14, 2009, incident was

entirely reasonable. On consideration shortly after hearing about the events immediately after they

occurred, Dean Wielk, as he testified, could quite properly conclude that nothing warranting

discipline had happened. It is apparent that he, too, credited the women's account, and not that of

the plaintiff. In any event, the fact that he heard the matter out, albeit informally, would have made

---

[12] Defendant's cross-examination of the plaintiff provides further support for my
conclusion that plaintiff was not a trustworthy witness. According to reports, she twice made
statements that belie her testimony. Plaintiff made statements to a: a) resident advisor about the
October 2, 2009, events ("just hanging out with friends"; "everything is fine"); and b) police
officer about the October 14, 2009, event ("the subjects made no statements or aggressive
movements towards her").

The authors of those reports had, of course, every reason to be accurate in what they wrote about
what plaintiff told them. That plaintiff sought to repudiate, rather than explain those statements,
recorded in an official, or semi-official capacity, casts additional doubt on her overall credibility.
Even aside from these inconsistencies, I find plaintiff's version about what happened (or, more
accurately, what did not happen) on October 14, 2009, far less credible than the testimony of
Segalla and Donquah.

clear that he would do likewise in the future – and possibly invoke severe punishment – were any members of the sorority to bother the plaintiff (or the other pledges) in any way.

The overall actions the University took to ensure the plaintiff's safety likewise were reasonable and adequate to accomplish that purpose. It was not unreasonable for the University to relent somewhat and permit the students – even those most culpable for the hazing – to resume their studies. What they had done, though a serious infraction of an important University regulation, did not justify a more aggressive or lasting response, at least at the outset.

Thus, I conclude that nothing occurred that early afternoon that in any way could have generated emotional distress, much less, compensable emotional distress. In any event, though it might have been foreseeable that the plaintiff and members of the sorority might see one another from time to time on a small urban campus, merely being nearby as she and they otherwise went about their daily activities would not have violated the no-contact order. That order, as I interpret it under all the circumstances, meant simply that the sorority women could not engage in the sort of harassing activity that plaintiff claimed they (but which I find they had not) committed that morning.

With regard to the encounter in plaintiff's dormitory room, I find that those circumstances were simply not foreseeable. Plaintiff's return was entirely unexpected. The no-contact order did not cocoon Segalla. She had no duty to refrain from all contact with persons other than the plaintiff. Provided she abided by the no-contact order, she could enjoy the company of anyone with whom she chose to be.

The same is true for the plaintiff's roommate. When the plaintiff was absent and not expected to be present, the roommate could invite anyone she chose into their shared space.

Finally, even if the roommate had been aware that plaintiff might return, Segalla, unless she were also aware – which clearly and indisputably she was not – could accept the invitation to stop by for a few minutes before going to supper. In other words, Segalla did nothing to violate the no-contact order by going to plaintiff's room. She was unaware that there was any risk that plaintiff would appear.[13]

Viewing all the circumstances objectively, Segalla, therefore, did not violate the no-contact order by being present when plaintiff and her family unexpectedly appeared in the room. There is no evidence whatsoever that Segalla chose deliberately, willfully, or knowingly to be there when plaintiff was expected to be present as well. Nor is there any reason to believe that she would have been there had she known of the possibility that plaintiff might be present as well.

Thus, from the SHU's standpoint, Segalla was complying with what it required. There was nothing more that SHU could reasonably have done or expected. It could not foresee the circumstances of every possible random encounter between the plaintiff and members of the sorority. Nor could the SHU foresee that something of that sort would happen while Segalla was in complete compliance with her obligations under the no-contact order.

The no-contact order was entirely reasonable. It kept the plaintiff free from any reasonable apprehension that members of the sorority would get in her way or trouble her as she went about her normal routine as a student. No more was necessary to protect her and keep her from any risk of harm at the hands, or as a result of the actions of, members of the sorority.

### Conclusion

---

[13] The credible testimony about what happened when plaintiff entered, saw Segalla, and collapsed, makes clear that Segalla was also surprised and very concerned about having been in the room when plaintiff entered.

I find, accordingly, that SHU is not liable for any consequences of what plaintiff experienced following her report to it of the hazing incident. The University's response was forceful, measured, and entirely effective. One incident did not occur as plaintiff claimed – and, in any event, Dean Wielk acted appropriately by investigating the different versions and concluding discipline was not warranted. The other incident was not foreseeable, and did not involve any violation of the no-contact order. That order gave plaintiff entirely adequate protection, and reasonably ensured her well-being while on campus and elsewhere in the area.

It is, accordingly,

**ORDERED THAT** judgment be, and the same hereby is granted in favor of the defendant and against the plaintiff. Each party to bear its own costs.

The Clerk shall enter judgment accordingly.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge